## EDWARDS v. UNITED STATES.

### No. 9690.

Circuit Court of Appeals, Ninth Circuit.

Nov. 19, 1941.

G. V. Weikert, of Los Angeles, Cal., for appellant.

Wm. Fleet Palmer, U. S. Atty., and Walter M. Campbell and Wm. F. Hall, Asst. U. S. Attys., all of Los Angeles, Cal., for appellee.

Before DENMAN, MATHEWS, and STEPHENS, Circuit Judges.

DENMAN, Circuit Judge.

This is an appeal from a judgment, sought upon an information claimed to charge a criminal contempt, holding appellant Edwards guilty of contempt in violating an injunction of the District Court restraining him from violating an order of the Secretary of Agriculture, hereafter called the Citrus Order, limiting the volume of oranges to be shipped by him from the State of California into interstate commerce. No question is raised as to the validity of the Citrus Order (Cf. Edwards v. United States, 9 Cir., 91 F.2d 767) nor as to the validity of the injunction. Another defendant, a California corporation, Edwards Fruit Company, Inc., was adjudged not guilty.

Edwards at the conclusion of the Government's case below moved to dismiss, thus raising the question, inter alios, as to the sufficiency of the information. This question was not raised on the briefs, but at the hearing, where it was discussed by both parties and considered by us and was submitted for our decision.

The information nowhere directly charges that Edwards violated the injunction. It is difficult to understand why the draftsman of a criminal pleading should have avoided the plain statement that Edwards had made the described over-shipment, unless it was believed that he had not. Instead, after narrating the undisputed steps in the injunction proceedings, the information alleges that subsequently "Edwards caused to be filed in the office of the Secretary of State of the State of California articles of incorporation of the Edwards Fruit Company, Inc., [hereafter called the corporation] which corporation is the *alter ego or assignee* of Hugh David Edwards doing business under the fictitious firm name of the Edwards Fruit Company." (Emphasis supplied).

The information then describes the Secretary's order fixing the weekly proration periods and the prorate basis for the several shippers created under the Citrus Order and upon which the shippers are required by the Citrus Order to apply for allotments of citrus shipments in interstate commerce.

The information then alleges, "The defendant Edwards Fruit Company, Inc., *alter ego or assignee* of Hugh David Edwards, individually and doing business under the firm name and style of the Edwards Fruit Company, during one or more of the weekly prorate periods set forth above and in the regular course of its business processed, packed, sold, handled, and shipped oranges in defiance of and wilful violation of the applicable provisions of the Citrus Order and regulations issued thereunder. On April 25, 1940, the Edwards Fruit Company, Inc., by H. Edwards, President, acting by and with the consent and in behalf of Hugh David Edwards, filed an application for an allotment and a prorate base for Valencia oranges grown in Prorate District No. 2 with the Growers Advisory Committee of the California-Arizona Orange Grapefruit Agency. Thereafter the Secretary of Agriculture of the United States, acting upon the recommendation of the California-Arizona Orange Grapefruit Agency and upon other available information, established a prorate base for the Edwards Fruit Company, Inc., and fixed the allotments for the said Edwards Fruit Company, Inc. The said allotments permitted .the said company to ship Valencia oranges grown in Prorate District No. 2 in interstate commerce and from the United States to Canada during the weekly prorate periods set forth."

Nowhere is it alleged that Edwards had any allotment under the Citrus Order at the time of the challenged shipments. The information continues to describe the amount of such allotments for various weeks "for Edwards Fruit Company, Inc., acting in behalf of" Edwards and of shipments in interstate commerce in excess of such allotments by "Edwards Fruit Company, Inc., acting with the *consent and in behalf of*" Edwards. With respect to the word "consent", the injunction does not restrain Edwards from consenting to a third party violating the injunction.

Nowhere is it alleged that the corporation's relation to Edwards was that of agent and nowhere in the briefs is the claim made of a principal-agent relationship between Edwards and the corporation. The District Court's adjudication that the corporation was not guilty negatives that it could have been Edwards' agent in making the shipments, for the injunction also restrained Edwards' agents.

On the contrary, the corporation's challenged shipments are alleged in the information to have been made in "behalf of" and "with the consent" of Edwards in this alternative relationship of "alter ego *or* assignee." The injunction restrains the assignees of Edwards, but does not prohibit him from being an assignor of anything to the corporation, much less any contract he may have to ship oranges in the future for which there has not yet been received an allotment.

 In this alternative statement that the relationship was either that of "alter ego *or* assignee" we have a criminal pleading akin to an indictment which charges that Jones feloniously took the watch from the pocket of Smith with intent to keep it, *or* Smith handed the watch to Jones with the intent that Jones should accept it as a gift. Obviously, an indictment which thus alleges facts upon which the accused is innocent of wrongdoing cannot be held valid because he *might have been* doing the something criminal alternatively pleaded.

Criminal proceedings should not be so framed. The Government's brief, naturally enough, treats only of the alternative which it believes constitutes a criminal contempt, i. e., the alleged alter ego relationship. It is silent as to the alleged assignor-assignee relationship as it is as to that of principal and agent. Respecting the phrase "alter ego," nowhere is it alleged that Edwards dominated the corporation or even that he created it,—the only allegation in the latter regard being that he was the person who caused its articles to be filed with the Secretary of State, two and a half years before the challenged shipments. Filing is a mere clerical matter, not evidence of dominance.

The problem then arises whether the mere Latin phrase *alter ego,* when used in a criminal information with reference to a corporation and an individual, is an allegation that the individual so dominates the affairs of the corporation that it has no existence apart from the individual, but is *in fact the individual and not a separate entity at all.* The Latin phrase is considered by Webster's New International Dictionary, Second Edition, in defining the word "ego" as " * * * The self, whether considered as an organization or system of mental states, or as the consciousness of the individual's distinction from other selves and so as contrasted with an *alter* or *alter ego.*"

▮ Here the phrase is disjunctive in meaning. This definition certainly would not advise the accused that he was charged with dominating the corporation so completely that it had become merged in him and had lost its corporate identity.

No case, even civil, is cited to us in which the phrase is used in the pleading as a substitute for the required allegations of dominance by and merger of the corporation into an individual. There are several opinions in civil cases where the phrase is applied to a situation where such dominance over a corporation has been proved, such as Nelson v. Parker, 104 Cal. App. 770, 286 P. 1078. However, we do not believe that in criminal pleading the phrase advises the accused of such dominance and merger. We hence conclude that even if it were valid to plead two alternative sets of facts, one set showing the accused innocent of wrongdoing, the other merely attempting to use the phrase "alter ego" as showing dominance in wrong doing, the pleading here does not state facts sufficient to show criminal violation of the injunction.

▮ We cannot find in the evidence any facts sustaining a charge, if properly made, that Edwards so dominated the corporation that the two are merged in one. On the contrary, it appears that the corporation's sole stockholder was Mrs. Ray Edwards, the mother of appellant. She was so at all times from its incorporation on December 11, 1937, when she was the sole subscriber, paying $500 for her stock. Cal. Civ.Code, § 278; Williams Co. v. Leong Sue Ah Quin, 44 Cal.App. 296, 298, 186 P. 401. She was a business woman who operated an auto camp prior to her taking over the direction of her packing plant. The testimony that she dominated the corporation in the transaction of its business is not contradicted.

The business of the corporation consisted in purchasing citrus fruits, processing them in a plant wholly owned by Mrs. Edwards and shipping them in part, at least, in interstate commerce. The plant was purchased by Mrs. Edwards with her own funds. Her investment must have been a considerable sum, for she later mortgaged it for $10,000.

The business was conducted at a loss. Mrs. Edwards, at a salary of less than $200 a month, managed the plant and handled all the company's finances, making up the losses of the business out of her personal funds. To raise funds to meet outstanding obligations of the corporation, she made the mortgage on her plant for $10,000 and so used the proceeds. This was not enough. She contributed a further sum of $2,000 of her personal funds.

Appellant contributed nothing to the corporate financing and received nothing from it save his salary as sales manager.

The corporation's board of directors at its incorporation in December, 1937, consisted of Mrs. Edwards, two sons-in-law,— a Mr. Graham and a Mr. Goebel,—and the appellant. The latter was given the position of president and general manager, but his actual function for the business of the corporation was that of sales agent at a salary of $200 per month. A daughter, Ruth Edwards, was bookkeeper. With the uncontradicted evidence of the dominance of Mrs. Ray Edwards, the sole stockholder and owner of the plant, making good all its losses over two and a half years of operations, a strong case could be made that she and the corporation were *a single*

identity. But that is not the Government's contention here.

In July, 1940, prior to the challenged shipments, the board of directors was filled with three new directors,—a Mr. Blakeman, a Mr. Seeley and a Mr. Garrett. There had been other changes in the board in the two and a half years since the incorporation on December 11, 1937, and the shipments in August, 1940.

It is not contended that in these two and a half years of active processing and shipping up to August, 1940, the corporation had made any shipments in excess of its quotas. All the challenged shipments were made by the corporation after that date. None was on a contract of Edwards or of fruit owned by him. Regarding the challenged shipments in August, 1940, appellant Edwards testified that as sales manager he had protested to the directors of the corporation against the corporation making them, and that they were made despite his protest on the advice of the company's counsel. The directors were not called to contradict him.

The Government contends that all the acts of investment by the business woman Mrs. Edwards and her long management of the plant in a citrus business conducted by the corporation, was but a scheme in Edwards' mind to have a corporation which, after two and a half years of proper conduct of its corporate trade, would be available to him to avoid violating an injunction served on him over a year before the incorporation.

The Government's claim is that because Edwards previously to the incorporation had processed citrus fruits in Mrs. Ray Edwards' plant, which she took over after Edwards failed to pay her rent, and exported them in violation of the injunction, and had paid a fine of $100 for one shipment two months after the incorporation on a personal contract made prior to the incorporation, and with which contract and shipment the corporation had no connection, he must have dominated the corporation from the beginning and actually conducted its business so that 29 months later he in fact used the corporation to conceal his connection with shipments by the corporation in excess of the corporate quota, which shipments were processed by the corporate funds not supplied by Edwards and concerning which he had no financial interest in their sale. To us such an inference is but one of the "fanciful conjectures" as that phrase is used by Chief Justice Hughes in Borden's Farm Products Co. v. Baldwin, 293 U.S. 194, 209, 55 S.Ct. 187, 79 L.Ed. 281.

Nor can we see any evidence of domination in a verified application signed by Edwards as president of the corporation in September, 1940, that is, *after* the challenged shipments, to procure the issuance of the stock certificate showing Mrs. Edwards' then nearly three year ownership of her stock. The application was drawn in the form it should have been had it been made on December 15, 1937, when the board at its first meeting authorized it. It named the original officers of the corporation who had long since ceased to serve, and it states the corporation had no assets or liabilities except Mrs. Edwards' stock subscription and the costs of incorporation. We do not see in this application, obviously drawn with reference to the time of incorporation, any evidence that the corporation in September, 1940, had been a "hollow lifeless shell" in the two and a half years it had been operated by Mrs. Ray Edwards in her valuable plant, and had had all its operating losses paid by Mrs. Edwards personally to the extent of at least $12,000. We do not agree that such evidence is, as claimed by appellee's briefs, "amply sufficient beyond all reasonable doubt" of the guilt of the accused. On the contrary, we do not regard it, when taken alone or in consideration with the uncontradicted evidence of the independent activities of the corporation as evidence of guilt of any persuasive weight.

The judgment is reversed.